IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH
CENTRAL DIVISION

UNITED STATES OF AMERICA, )
Plaintiff, )
vs. ) Case No. 2:07-CR-149TS
DINO NICK MITCHELL, )
Defendant. )
____________________________)

BEFORE THE HONORABLE TED STEWART
--------------------------------
May 29, 2009
Jury Trial
Testimony of Dino Nick Mitchell

REPORTED BY: Patti Walker, CSR, RPR, CP
350 South Main Street, #146, Salt Lake City, Utah

A P P E A R A N C E S

For Plaintiff: Michael Kennedy, AUSA
Scott Romney, AUSA
185 South State Street, #300
Salt Lake City, Utah 84111

For Defendant: Robert Steele
David Christensen
UTAH FEDERAL DEFENDER'S OFFICE
46 West Broadway, #110
Salt Lake City, Utah 84101

I N D E X


| Witness | Examination By | | PAGE |
|---|---|---|---|
| Dino Nick Mitchell | Mr. Steele | (Direct) | 4 |
| | Mr. Romney | (Cross) | 24 |
| | Mr. Steele | (Redirect) | 66 |

EXHIBITS RECEIVED INTO EVIDENCE:

| | |
|---|---|
| Defendant's J | 19 |
| Plaintiff's 24 | 58 |
| Plaintiff's 25 | 59 |

SALT LAKE CITY, UTAH; FRIDAY, MAY 29, 2009; 8:30 A.M

(Proceedings not transcribed)

MR. STEELE: Yes. I would call Dino Nick Mitchell to the stand.

THE COURT: Mr. Mitchell, if you would please come forward.

DINO NICK MITCHELL,

Having been duly sworn, was examined and testified as follows:

THE CLERK: If you would please state and spell your name for the Court.

THE WITNESS: My name is Dino Mitchell. D-i-n-o, M-i-t-c-h-e-l-l.

DIRECT EXAMINATION

BY MR. STEELE:

Q What is your middle name?

A Nick, N-i-c-k.

Q Where do you live?

A Phoenix, Arizona.

Q How long have you lived there?

A About four years.

Q Do you live with family there?

A Yes. I live with my wife and my kids.

Q How many kids?

A I have three kids, two girls and a boy.

Q How do you make a living?
A I buy and sell cars. And I also work in Las Vegas, Nevada for a Black Bird Realty, it's a property management, and also another property management that's called New Envision.
Q What do you do for the property management companies?
A I do roofing, asphalt, and also all types of concrete, block wall.
Q Where does your father live right now?
A Right now he is in Phoenix, Arizona -- well, I should say -- it's called Sun City. If you are over 55, you live in that area. So it's in Phoenix.
Q How long has he been in Phoenix this last time?
A I would say about a year and two or three months.
Q How did he come to live in Phoenix?
A Well, he was in Detroit. He got remarried. Detroit is very cold, he got sick, caught pneumonia and other sicknesses. So I told him to move back to Phoenix where I could take care of him and pay attention to him.
Q Had he ever lived in Phoenix before?

A Yes, since 1980 or '81.
Q How old are you, Dino?
A I am 39 years old. April 19th, just turned 39.
Q Did you like to smoke marijuana?
A Yes, I did.
Q How often did you smoke marijuana?
A Every couple, two or three hours. I smoked it when I was 12 years old, actually started.
Q Do you smoke marijuana now?
A No. I changed my life around and just been going to churches and gave up marijuana, and just taking care of my family and doing the things that I'm supposed to be doing in life. I just really changed my life around.
Q How long did you go to school?
A I went to seventh grade in California in Anaheim, and that's the farthest I went, seventh grade.
Q What did you do when you left school?
A I was working with my dad doing asphalt, driveway seal coating, patching, striping.
Q That's pretty young. Is that typical?
A Yeah, that's normal for the gypsy ways of living.

Q You've heard testimony about all kinds of travel arrangements, you heard that yesterday?
A Yes, I did.
Q Do you like to travel?
A Love to travel.
Q How often do you travel?
A This year probably did about maybe like 17, 20 trips this year.
Q Why do you like to travel?
A Well, it's fun. We get to, you know, see the other side of the world, different people. And sometimes we have sick people that's in the hospital or weddings. My dad is well known, we have high respect, and they call us to their weddings or hospitals, whatever the occasion might be. And sometimes if my dad don't go, the sons will go to pay the respect for my dad.
Q You heard about a trip to L.A. with Danny Leo?
A Yes, I did.
Q How long had you known Danny Leo when you made that trip?
A Rough idea, I would say probably a month or two.
Q You know him well enough to travel with

him?

A No, I don't, but in the gypsy ways we intend -- if you are a gypsy, you are more than welcome in our houses and you are highly respected.

Q Did you go to the Bicycle Club in L.A.?

A Yes, I did.

Q Who did you meet there?

A Actually me and Danny went to gamble, and I was playing a table game, it's called Pan Nine. It's sort of like a 21 game, but it just goes up to nine. I was gambling and I won a few dollars. Danny approached me with this gentleman named Steve. I'd never seen him and I don't know who it was actually. I shook hands with the guy. They were going to eat at the Bicycle Club, it is a Chinese restaurant, and they offered me to go eat. But I wasn't hungry, I was winning, so I figured I would stay on that seat and try to win some more money. So they went off to eat.

Q Did you talk about savings bonds with Steve?

A No, I did not.

Q Did you travel to San Diego?

A Yes, I did.

Q Who was in San Diego?

A It was me, Danny Leo, my brother Paul, and Tony -- Danny Leo's cousin by the name of Tony.
Q Did you go to see anybody in San Diego?
A Yes. My daughter -- my oldest daughter had trouble with her husband, they had a fight, and she called me over to pick her up and bring her back home.
Q Did you pick her up and bring her back home?
A Well, we got to Tijuana -- I mean San Diego, and I guess it took us a couple days before I left. And I guess they made back up and she decided, I guess, to try it out. She has kids and stuff and she didn't want to destroy her home or anything, you know.
Q You went to Tijuana?
A From there we went to Tijuana and partied.
Q What did you do in Tijuana?
A We got a room by the border and we went and we ate some steaks and seafood, and we partied, we smoked, we drank and, excuse me, partied with some women.
Q Had sex?
A Yes, we did.
Q Cheated on your wife?

A Yes, I did. I'm very sorry about that.
Q On your return -- where did you go from L.A.?
A You know, I don't recall everything actually, but from L.A. I believe -- don't hold me against it, but I believe we did come back to Phoenix. Then I got -- my wife told me she got the phone call and if I can go up there to pick up our daughter.
Q Who's Tony Mitchell?
A Tony Mitchell --
Q Is that the name you know him by?
A Actually it was Tony Green. He's not a Mitchell. He's not related to me in any way, no.
Q Who's Tony Green?
A Tony Green is Johnny Raymond's and Shawn Green's uncle.
Q Do you know Tony Green?
A Not real well, no. He knows my dad and he knew my brother also. He was at the house one day and I met him.
Q How did he come to be at your house?
A He smokes marijuana also, so we intend to be friends, you know. So we smoked out and had a few, you know, joints and got to become friends.

Q Now you say you didn't know him very well, and you smoked marijuana with him?

A Yes, I did.

Q Did you talk about savings bonds?

A No, we did not.

Q Did they come over -- who did he come over to your house with?

A He came over a lot of times, so what time are you talking about? Well, I mean he came over with two nephews and we used to smoke weed there at my house. If the family was home, we would get in the car and go around the block and smoke a joint or two and come back.

Q Did you ever introduce Danny Leo to the three of them?

A Yes, I did, but not about the bonds.

Q When did you do that?

A I had a barbecue at my house and Danny Leo was there. Tony Green, Shawn and Raymond came over. I invited Tony actually and then he brought his two nephews over. I called Danny Leo. And my wife's family, I also called them, her brothers, her mom, her nephews. And I made a little barbecue and I invited some people over.

Q Did you ever make a trip to Sacramento?

A Yes, I did.
Q Why did you go to Sacramento?
A Well, after -- I don't recall how long, but after the barbecue, Raymond -- or Johnny Raymond said if I want to go up there and party, he had some gypsy girls there that partied, and he said they have very good marijuana out there in Sacramento, California. And he said we can go stay, you know, two, three, four days and smoke out, party and he will introduce me to these gypsy girls and just have a good time.
Q Any talk about the bonds going to Sacramento?
A No, we did not. There was no talk at all about bonds or anything.
Q Are you telling us you knew nothing about the bonds?
A I knew nothing about the bonds.
Q How is that possible? How did you not know about these bonds? You are with these guys.
A Well, they didn't talk about it in front of me I guess. They didn't mention anything about bonds. It was just mainly let's go out and party, you know.
Q You know these guys?

A For a few months, yeah.
Q Why wouldn't they tell you? Do you know?
A That I can't answer. I don't know. All I know is they never brought up the subject about bonds or anything in front of me.
Q Did you party in Sacramento?
A Yes, we did.
Q Did you ever have contact with your wife while you were in Sacramento?
A When I left, I told her I was leaving to do some business, asphalt parking lot repairs. And we went to Sacramento and I partied that night. We smoked and drank and I got all messed up. And, as I recall, I think it was the next morning I get a phone call from my wife and she asked me if I was there on a business trip or pleasure. And I told her, no, it was business. And she said, well, no, I found out from the gypsy chatline that you were partying with some gypsy girls and that I had sex with a gypsy girl. So I fronted her with the truth and said, yes, I did.
So she told me --
MR. ROMNEY: Objection, Your Honor, this is hearsay.
THE COURT: All right. Why don't you ask

a direct question, if you can.

BY MR. STEELE:

Q You were supposed to go back to Sacramento -- I mean to Phoenix?

A Yes. I was using her Tahoe.

Q But you didn't do that. Why?

A Well, she told me not to come back home.

MR. ROMNEY: Objection, Your Honor. Same objection.

MR. STEELE: Your Honor, it's not hearsay in terms of it's what generated what he did. We're not asserting anything other than why he made the next move he made.

THE COURT: I will allow you to go ahead.

THE WITNESS: Thank you.

BY MR. STEELE:

Q Just briefly, why didn't you go back?

A She told me not to come back because I had sex with another woman.

Q What did you decide to do at that point?

A Well, it was kind of confusing. I was drunk and that stuff the next morning and I was undecided what to do. She told me not to come back. So Danny Leo and the boys told me they were going to Chicago to visit this gentleman by the name of

Steve -- or Stele Costello, that his wife was in the hospital. They said if you -- I told them I was going to Detroit. That's where my dad lives, so it's the only place I have to go to live. And so I was on my way to Detroit. They said they were going to Chicago. So I figured this is an opportunity to get as close as I could to Detroit without having much money.

Q Dino, why is it that they paid for your ticket to Chicago?

A Well, actually I loaned some money to Danny Leo and he didn't pay me back, so that 400 kind of like got me to Chicago.

Q Is that typical, this spending money for each other on a trip?

A Well, we're gypsies and we know we're good to pay back, so I trusted him and said yes.

Q Were you there when they bought the train tickets?

A Yes, I was. I just don't recall what time or anything was or what date.

Q Did they buy the train tickets -- did you all buy train tickets the first day you got there or the day after you partied?

A I believe it was the next day. I think it

was the next day. It wasn't that day, it was the next day.

Q What day did you get to Sacramento, do you remember? What time of day did you get to Sacramento?

A I think it was early morning. I can't give you exact times, but I think it was early morning.

Q How were you going to get from Chicago to Detroit? I mean you are getting closer, but you don't have any money. How are you going to get there?

A Well, I was going to try to contact my dad or my oldest brother and see if they could wire me some money to get a plane or a bus or some way how to get there. But I guess my family would help me out at that point.

Q Had you had contact with your dad?

A On the train --

Q Before getting on the train, had you had contact with your dad?

A Yes. Yes.

Q By phone?

A By phone.

Q Did you try and get ahold of him on the

train?
A Yes, I did.
Q Were you able to?
A No.
Q You heard what Special Agent Argyle said about your father's phone?
A Yes. Just a little while ago you are referring to?
Q Yes. Is that what you told him?
A No. Actually I told him that I was trying to call to my dad because I had a couple of phone calls on the train saying my dad was bad sick, he was in the hospital. So I told my sister and my brother, well, I'm going up there anyhow because I had trouble with my wife and I will see what's going on when I get there.
So I tried to call my dad at a number that was for him, my stepmom, where they lived, and this gentleman answered the phone. I asked for my dad and he said that my dad no longer lives there. And I am like, yes, we just spoke to him like five days ago. He told me not to call back anymore and hung up on me.
Q Dino, you entered a guilty plea in this case?

A Yes, I did.
Q Do you remember doing that?
A Yes, I do.
Q When did you do that -- not the date, but what was the occasion?
A It was the day of my trial.
Q Why -- were you ready to go to trial?
A Yes, I was.
Q Why did you plead guilty?
A Well, my mom and my oldest brother was here the day of the trial, and my attorney gave me a letter and also talked to me by phone and pressured me a lot saying that if I do lose the trial, I'm looking at five years --

MR. ROMNEY: Objection. This is hearsay, Your Honor.

MR. STEELE: Your Honor, it really goes to his state of mind more than what he was actually told. If I might proceed in a different way?

THE COURT: Go ahead.

BY MR. STEELE:

Q Dino, let's back up and talk about before the day of trial. I have what has been marked Defendant's Exhibit J. Do you know what that is?

A It's a letter from my former attorney, Deirdre A. Gorman.

Q What is the date on it?

A February 7th of 2008.

Q Did she tell you --

THE COURT: Are you going to offer it, Mr. Steele?

MR. STEELE: Yes. I'm sorry, Your Honor. We would offer that and ask that it be admitted.

THE COURT: Any objection?

MR. ROMNEY: Yes, Your Honor. The government objects on the grounds of hearsay under 803 as well as relevance under Rule 403.

MR. STEELE: Your Honor, the relevance is it is -- it would be hearsay, but it's not being admitted for the truth of whatever Ms. Gorman might -- her analysis might be. It's being admitted for what Dino's reaction was and how it led him to take the actions he took.

THE COURT: The Court will overrule the objection and allow the admittance of Exhibit J.

(Defendant's Exhibit J was received into evidence.)

BY MR. STEELE:

Q Dino, if you would look at the first -- well, do you remember reading this letter?

A Well, yes. It's been a while, but --

Q Did she tell you that there was a plea agreement and what kind of jail time you could do?

A Yes, she did.

Q What do you remember -- what did she tell you, what do you remember was the plea agreement, what was the jail time, prison time in the plea agreement?

A I believe she told me like 16 months and 54 days off a year. And if I do good time, that I could probably do like nine months of incarceration and the rest in a halfway house.

Q Did she tell you what would happen if you went to trial and lost?

A Yes, she did.

Q What is your memory of what she told you?

A She told me that I would probably get about five years.

Q If you look at the first two paragraphs of the letter, if you would review that briefly.

A Read it out loud?

Q No. Just review it to yourself.

A The first two?

Q The first two paragraphs.

Dino, in addition to being told, is that what is in the letter?

A Yes, pretty much.

Q If you will look on the second page.

A Okay.

Q Count up from the bottom -- the third paragraph from the bottom.

A Okay.

Q The one that starts also you should. In there does she tell you how much time you'd get if you were convicted?

A Around five years.

Q So this all happened before you walk in to trial?

A About 15 to 20 minutes before trial.

Q Well, you got this letter before you got to trial?

A Yes. I thought you meant when she was talking to me about it. I'm sorry.

Q You walk in to trial. Who talks to you 15 minutes before trial?

A My former attorney, Deirdre Gorman, and my brother Rickey Mitchell and my mom was out in the

hallway.

Q Why did you plead guilty?

A I was scared to death. I didn't know this was -- I didn't know it was going to be like this, and I just -- it was like I was in the wrong room looking for a corner, there was no corner, and I had no way to explain my innocence. It's sort of like you are doomed, you know, you are gone. So I was scared. I didn't know what to do.

Q So a little bit after that you entered your guilty plea?

A Yes, I did.

Q Did you believe you were guilty?

A No, I was not guilty.

Q But you did say that?

A Yes, I did.

Q It wasn't a short discussion that you had with the Judge, it was a long discussion?

A When I came in to plead guilty?

Q Yes.

A Probably lasted maybe 20, 30 minutes I guess.

Q So people -- you had to answer a lot of questions?

A Yes.

Q What did you do after you pled guilty?
A After I pled guilty?
Q Uh-huh. (Affirmative)
A I went back home. Mr. Judge Stewart told me in 72 days that I will come back and have a sentence. And I went home and I just couldn't -- I couldn't deal with my life. I couldn't sleep. I was bothered about pleading guilty. And so I decide to write a letter directly to Mr. Judge Stewart about my former attorney knowing because I felt she wasn't helping me in this at all. I felt alone in this action.
Q What did you tell Judge Stewart in that letter about your guilt or innocence?
A That I was not guilty.
Q Dino, did you know anything about these bonds?
A No, I did not, sir.
MR. STEELE: That's all I have.
THE COURT: Mr. Romney, how long do you expect your cross to take?
MR. ROMNEY: Forty-five minutes, Your Honor. Maybe an hour.
THE COURT: Okay. Why don't you go ahead and get started.

MR. ROMNEY: Thank you.

Your Honor, if we may approach on that?

THE COURT: Yes.

(Side-bar conference held outside the hearing of the jury and on the record.)

MR. ROMNEY: I may get into the letter earlier than I thought. We still haven't gotten that unsealed. So I was wondering how you wanted to handle that. I probably have 15 minutes -- ten minutes before I get to the letter.

THE COURT: The only thing I'm worried about is the copy that will go to the jury, if you offer it, it has the material redacted. Basically for your presentation, it will be redacted. The Court will unseal it and I'll allow you to use it as an exhibit.

MR. STEELE: Absolutely, Your Honor.

MR. ROMNEY: That's all I have.

CROSS-EXAMINATION

BY MR. ROMNEY:

Q Mr. Mitchell.

A Yes. How you doing?

Q Your testimony here today is that you were on that train because you wanted to go see your

father in Detroit; is that correct?
A And also I had problems with my wife, yes.
Q And your testimony today is that you didn't know anything about those bonds until the police found them in Donny's bag at the train station in Helper?
A Correct.
Q It's your testimony that that's been the truth from the very beginning; is that right?
A Yes, pretty much.
Q So you would agree, then, if this has been the truth from the beginning, you had no incentive, no reason to lie or to mislead the police when they interviewed you about these bonds, right?
A No, I had no intentions to lie to them. I was nervous, but --
Q Nervous, but you had nothing to hide; is that correct?
A No.
Q But you didn't know what hospital that your sick father was in in Detroit?
A No, because I tried to make a phone call and couldn't get any result out of it.
Q You didn't have a telephone number for your father either?

A I did, it was a home number for him, but he was in the hospital at the time so I couldn't get any information on the other side.
Q In fact, you did get some information on the other side, correct?
A That was from my sister and my brother that I got information that my dad was sick in the hospital, yes.
Q You told the officers when you were interviewed that somebody picked up the phone and said Dino don't live anymore; is that right?
A You said Dino don't live here?
Q Excuse me, your father, his name is Nick Mitchell?
A Nick Mitchell.
Q Nick Mitchell doesn't live here anymore?
A That's what he told me, but that didn't give me any information if he was fine, dead or in the hospital or what.
Q You didn't know who that was?
A No, I did not.
Q This was the home phone number for your father?
A Yes. I assume it was her son or something, or maybe her son-in-law.

Q But you didn't ask who it was?
A No, he didn't give me too much of a chance.
Q You didn't give the officers at the time an address of either the hospital or your father in Detroit?
A I didn't know what hospital because I couldn't get any information.
Q What illness did your father have that made him go to the hospital?
A He caught emphysema in Detroit from the cold weather and he's used to the hot weather in Phoenix, Arizona. He's an older man.
Q You told the officers that he had pneumonia?
A Pneumonia, emphysema and something else. I forgot what it was to be honest with you.
Q You expressed quite a bit of concern about the severity of your father's illness?
A Sure, of course.
Q In fact, you told the officers that your dad could die at any moment, correct?
A As far as I know from the sickness that I heard, you know, it could be dangerous, you know.
Q Another time in the interview you said he

could be dead already?
A I was just assuming, you know. He could have, maybe, I didn't know. In other words, I didn't know what was going on. I didn't know what happened.
Q But you knew it was serious?
A Yeah. For old men pneumonia, emphysema, it's bad.
Q But the seriousness of your father's illness didn't stop you from going on vacation and partying in Los Angeles?
A I didn't know at the time that he was sick.
Q Let's talk about when you did know that your father was ill. You said here when Mr. Steele was questioning you that you found out on the train to Chicago, correct?
A Right.
Q That was February 18, February 19?
A Approximately, yeah.
Q But you told the FBI in your interview when you got kicked off the train that you had found out that your father was in the hospital three days before?
A I don't recall that. I think -- well, you

know --

Q Let's look at your transcript. I'm showing you your exhibit -- okay, this is Defense Exhibit E. I will turn to page 58 for you. And let me turn your attention on that page to the fourth paragraph from the bottom of the page where it says Mitchell and it begins, well, I'm going to my dad. Do you see that paragraph there, near the bottom of the page?

Do you see that paragraph?

A I'm looking where it says Mitchell.

Q Let me point that out to you.

A I'm sorry. Where it says well?

Q Yes. If you will read that to yourself and then look up when you're done, please.

A Yes. Finished.

Q So you do remember now that you told the FBI I was going to go to my dad, he's in the hospital, he's been there for four or five days now, which I didn't know about until three days ago before I left?

A I was on the train. Actually I slept most of the way. I was assuming that I was on the train for two or three days, but I guess it was two days I was on the train.

Q But, Mr. Mitchell, you weren't on the train for two days, right?
A I think it was like pretty close to two days, a day and a half or so.
Q You said that your father -- I'll move on.
Now you didn't fly directly to Detroit to see your father, from Phoenix?
A You mean from Sacramento?
Q No, from Phoenix.
A No, because I didn't know at the time.
Q And you didn't drive your own car there either?
A To Detroit?
Q Right.
A I mean Chicago?
Q To either one.
A I drove my car to Phoenix -- to Sacramento.
Q And Sacramento is in a different direction than Chicago or Detroit?
A Yes, it is.
Q And so even though you were concerned about your father's life, you chose to drive your own car ten hours to Sacramento and then get on a train that was going to take at least two days to

get to Chicago?

A Well, let me tell you like this. At the time I did not know my dad was in the hospital. So if I didn't know, I went to Sacramento to party and then from there got in trouble with my wife from having sex with another woman. I had no choice to go to Detroit. That's when I discovered the phone call, I think the next day or day and a half, whatever it was. My sister called me and my oldest brother called me and said, we think dad's in the hospital, he's sick with emphysema or pneumonia. So I said, I'm on my way there, because of the trouble I had with my wife, and I'll check this out as soon as I get there.

Q Mr. Mitchell, you planned to go to Chicago or Detroit when you were in Phoenix?

A No, there was no plan.

Q But that's what you told the FBI?

A When I was in Sacramento, Danny Leo told me that -- I believe this is correct, Danny Leo told me -- it could have been in Phoenix or Sacramento, but he did tell me that Stele Costello's wife was sick and they were planning a trip to go to Chicago to go see Stele's wife that was in the hospital, and that they were going to eat and drink and party

also.

Q That was in Phoenix, correct, and that's when you --

A It was either Phoenix or Sacramento, I don't recall.

Q Well, you know, you've been in here in trial, you know you put $400 on Danny Leo's credit card to go and price a Rent-A-Car to go to Chicago, correct?

A No. Actually I think we were going to San Diego.

Q Okay. But that's not --

A Well, there's a lot of things that's been taken out of the record and a lot of things have been put in the records from all that I've been hearing.

Q Is your testimony that the audio recording of your interview with the FBI has been altered?

A No, but there was a few things in there that the jury did not hear.

Q That was your voice on the recording, correct?

A Yes, it was. It was a part where I was explaining the story about my wife and I was crying, they gave me a napkin, and we ate a pizza, and that

was not heard on the tape, that was not played.

Q Well, Mr. Mitchell, you never told the FBI that your wife was upset with you because you had been partying with girls?

A Yes, I did.

Q You did?

A Yes, I did, sir. As a matter of fact, one of them gave me napkins. I was crying and I said, I apologize for crying and stuff like that because I felt bad because of what I was doing.

Q You've reviewed your transcript with the FBI, correct? You have reviewed -- that is your exhibit?

A I read this a couple years ago I guess.

Q Can you point out where you told the FBI that your wife was upset with you for partying with girls or where you were crying and asked for a tissue?

A I have to read all this? I don't know where it would be at.

Q Would you like to take a few minutes and find it?

A It's going to take me a little more than a few minutes. I'm kind of slow at reading, so I apologize for this.

THE COURT: Mr. Romney, do you want us to take a break and give him that opportunity?

MR. ROMNEY: Yes, Your Honor, please. Thank you.

THE COURT: We'll take a 15-minute recess.

(Jury excused)

THE COURT: Mr. Steele, you have a motion to make, a Rule 29 motion?

MR. STEELE: Mr. Christensen will be making it.

THE COURT: While he's making that, do you want to spend time with your witness to see if he can find --

MR. STEELE: I would ask whether or not that is what counsel wants.

THE COURT: Mr. Romney --

MR. ROMNEY: Yes, I do, absolutely.

THE COURT: -- do you object to that?

MR. ROMNEY: No objection.

MR. KENNEDY: We have no objection to that.

THE COURT: You may do so, then, Mr. Steele.

Mr. Christensen.

(Proceedings not transcribed)

(Recess)

THE COURT: Are we ready, counsel?

MR. ROMNEY: Yes, Your Honor.

MR. STEELE: Yes, Your Honor.

THE COURT: Ms. Malley.

(Jury present)

THE COURT: Go ahead, Mr. Romney.

BY MR. ROMNEY:

Q Mr. Mitchell, you were given a break to look through the transcript. You didn't find anywhere in that transcript where you talked about your wife being upset with you, did you?

A No, my attorney did not find it. I believe it was before we were recording or written, writing it down.

Q You didn't tell anybody about your plans to go to Detroit or that your father was sick, correct?

A As in did I tell who?

Q Anyone, until you were arrested.

A No, I told the boys that I was with.

Q But you didn't tell Danny Leo?

A Yes, I did.

Q He was here testifying yesterday, and you recall that, right?

A So much, yes.
Q He said you never mentioned going to Detroit, you never mentioned your father was sick. Do you remember that?
A I remember that, but he's wrong.
Q He was lying?
A I wouldn't say lying, but maybe he misunderstood or something, I don't know. He was wrong.
Q Did he also misunderstand the conversations he said he had with you about taking a bus back to Phoenix after you were done in Chicago?
A I'm sorry, sir. Say that again.
Q Do you recall him saying that the two of you had discussed taking the bus back to Phoenix where the two of you were living after you were done in Chicago?
A That was never mentioned.
Q Was he wrong about not even knowing the name of your father?
A He knows the name of my father.
Q Now the other four that were with you, they were also interviewed by the police when you were arrested, kicked off the train, correct?
A Okay.

Q And you didn't tell any of them you were going to Detroit to see your father?

A Yes, I did. It's actually -- I believe it's in the letter that I sent to Mr. Judge Stewart. I also did tell them that, but sometimes people forget.

Q But all we have to go by is your word on that, correct?

A It should be in the statement that I sent to Judge Stewart, which I wrote. I mean sometimes you are put under pressure and you tend to forget about things or something.

Q You hadn't made any travel arrangements in Detroit, correct?

A From Sacramento, no. I was waiting to get to Chicago to get some money. I didn't have a credit card even to book a flight or anything, so there's not much I could have did until I got to Chicago.

Q At the time you were arrested, you were having financial problems; is that fair?

A Yes.

Q And you were unemployed or sporadically employed; is that correct?

A Well, I was employed. I just wasn't

working at the time. When I get a phone call from Vegas, I go up there and work for them.

Q And you told Agent Argyle here that your wife had recently been laid off?

A She is a housewife. She never does work.

Q She never had a job?

A No. Gypsy ladies, we don't let them work. They are housewives.

Q Do you have that exhibit there in front of you?

A Yes.

Q Your transcript. Will you please turn --

THE COURT: You are referring to Exhibit E?

MR. ROMNEY: Excuse me. Yes, I am, Your Honor. Thank you.

BY MR. ROMNEY:

Q Will you please turn to page 36.

MR. ROMNEY: I'm going to ask Ms. Lauder if she will play the recorded version -- or the recording of that, and that is clip 15.

(Audio recording played)

BY MR. ROMNEY:

Q So at this time your wife had a job. She had been laid off. You said, those were your words,

that it put pressure on you, correct?
A Yeah, but this was before I actually married her. She was a seamstress. And when I married her, I didn't allow her to work because I made money buying and selling cars.
Q Mr. Mitchell, you said that it put pressure on you that she was laid off; is that correct?
A Well, yeah, put pressure on me because when I first married her, she didn't work anymore, so it's pressure on me to pay the bills.
Q You must have been looking at that time for a way out of that pressure, a way to get some cash; is that right?
A Not by stealing it, by working. I'm a working person.
Q But you said to Mr. Steele, when he was asking you questions, that you do home improvement type work, driveways and so forth. But we just heard when Agent Argyle asked you, you said you don't do that, you buy and sell cars?
A No, I buy and sell cars, and I work for Black Bird Realty in Las Vegas, and also do improvement in Las Vegas. I just did a job for them for $14,000 before I came here.

Q Okay. Well, let's concentrate on exactly what you said in that interview. You told the officers that you did not have a dollar to your name. Do you remember that?
A At the time I didn't.
Q And the only money you had was in your suitcase, some change?
A On me, yes.
Q And that is why you couldn't afford to fly to Detroit or go to see your father and that's why you had to get a free ride from the boys?
A Yes. I had money at home, but at the time my wife wouldn't give it to me because of what I did.
Q Now you just said your wife wouldn't give you money because of what you did, but what you did was in Sacramento, right?
A Where I had sex with another woman, yes. So from there I was leaving. I didn't go back home.
Q Okay.
MR. ROMNEY: Ms. Lauder, if you will pull up Exhibit 9, please.
BY MR. ROMNEY:
Q You know what this is, this is your plane ticket home from Los Angeles, right?

A Yes, that's what it says.
Q And the date on this is the 13th of February of '07?
A Okay.
Q That was just days before you were kicked off the train in Utah?
A Okay. Probably, yeah.
Q Is that right?
A I don't remember the date I was on the train actually. That's why I'm saying okay.
Q Well, you had money then to get on an airplane?
A Yeah, because I sold a Cadillac, which they found a bill of sale on the train in my suitcase. I think I got 55 or $6500 for it. And I had a few dollars in my pocket when I left to go to Sacramento to party with. My wife was holding the rest of the money.
Q So you had the money to take a vacation to Los Angeles where you went on a shopping spree, right?
A Yeah.
Q You bought jewelry?
A Yeah.
Q Jordan shoes?

A Yes.
Q Jordan shirt?
A Yes.
Q Jordan shorts?
A Jordan all the way.
Q You had money for all that, but didn't have money to go see your father who was ill in Detroit?
A At the time that I was shopping, I had money, but I blew it. My wife was holding the rest of the money that I sold the Cadillac. So that was all my money that I had on me.
Q You told the FBI when you were interviewed that the only way you could even afford to be on that train to Chicago is because the boys paid your way?
A Because I spent all my money shopping and traveling in San Diego.
Q Blew it in Los Angeles and so forth?
A Exactly.
Q But you still had $400 to put on Danny Leo's credit card right before you left for Sacramento?
A Because I sold a Cadillac and had money. Actually we went to the casino and he spent 900 or a

thousand dollars and he was broke and he told me, can you loan me four or $500 until I get in contact with dad or somebody to get more money. I said yes, and that's what the money was. And then we was going to San Diego and he said, well, I will rent the vehicle and stuff like that to return my money.

Q Again, your testimony today here is that you didn't have a plan to go to Chicago or to Detroit until you were in Sacramento?

A Did I have a plan to go to Chicago or Detroit?

Q Right.

A No. I went in my wife's Tahoe and I was returning in my wife's Tahoe. But when I had sex with another woman, it changed totally, everything went the opposite way.

Q Let's see what you told the FBI.

MR. ROMNEY: Ms. Lauder, if you will play clips five and six, please.

(Audio recording played)

MR. ROMNEY: I apologize. I think I'm playing the wrong clip there.

It's clip number six, the original six.

(Audio recording played)

BY MR. ROMNEY:
Q So you put the $400 in Danny's account in Phoenix?
A Yes, I believe it was.
Q And you told the FBI that the reason for that is to rent a car to go to Chicago and then to go to Detroit, right?
A Well, I don't recall exactly, but we was actually supposed to go to San Diego with that money, and so --
Q You didn't tell the FBI that?
A I don't recall to be honest with you. So that money stood in there. And when I got in trouble, I figured, okay, they are planning on going to Chicago either by car or plane or whatever, so I had credit for 400 bucks in there.
Q Okay. You were asked in the interview why you went to Sacramento first. Do you recall that?
A I'm sorry. Say that again.
Q That's my fault.
You told the FBI that the reason you were going to Sacramento was to pick up Donny?
A To pick up Donny? Donny was with us.
Q Right, exactly. But you told the FBI that the reason you had to go to Sacramento was to pick

up Donny, so that was not true?
A It was maybe a misunderstanding, but we were all together, all five of us.
Q You heard the clip that we played yesterday where you said you had to go pick up Donny in Sacramento?
A Maybe I did say that, but I didn't mean it that way or something, I don't know. Maybe it slipped out. Like I said, under pressure sometimes you say something that's wrong or right.
Q I want to ask you just a few questions about Stele Costello. You know Mr. Costello, right?
A No, I don't. I don't actually know him, no.
Q He's related to your wife, Mr. Mitchell?
A No, he's not. I thought he was at the time because they both speak Spanish, and my wife is a Mexican gypsy. I thought they were related, but they are not.
Q So that was wrong what you told the FBI in that interview?
A It was a mistake.
Q But you did also tell the FBI you were going to Chicago to visit Stele's wife?
A Well, because -- I'll explain it again. I

was on my way to Detroit, they were going to Chicago, so I figured I'll pay my little respect --

Q I thought you didn't know Mr. Costello?

A No, I didn't, but that doesn't mean I can't go to the hospital and pay my respect. But he does know my dad because my dad is like a judge for the gypsies. He settles their cases and other things. So that's how -- they have been on conference calls and that's how they knew each other.

Q You remember writing a letter to the Judge about a month after you pled guilty to this crime?

A I remember the letter, yes.

Q And in this letter you told the Judge that you knew the boys had sent some of the bonds to Stele Costello in Chicago?

A Well, the reason -- I will explain that. I didn't know at the time, but from the letter that Deirdre Gorman, my former attorney, was sending me, I've got stacks of letters like this, she said that they went to a post office to send some checks to Chicago, and that's how I knew about it.

Q You knew who Stele was at that time?

A From the paperwork that Deirdre gave me. That's how I know a lot of things actually.

Q You were going to visit a man's wife that you didn't know in a hospital?
A I wasn't really actually going for that. I was going to Detroit, kind of what happened between me and my wife. So they were going to Chicago. They were going to the hospital. I figured, okay, I will get down for an hour or two and pay my respects and off I go to Detroit.
Q That's part of the gypsy culture?
A Yes, it is.
Q If somebody is sick, it doesn't really matter where in the country, gypsies, they go and pay their respects?
A Yes, if they know of down the line. But if it's a complete, complete stranger that we don't know, we'll just make a phone call. But if it's someone that paid a respect to us, we'll pay the respect back to them, in a wedding or hospital or whatever it might be.
Q Your father, you testified with Mr. Steele, is a prominent member of the gypsies?
A He's sort of -- is he a what? I'm sorry.
Q A prominent member, and he's well known in the gypsy community.
A Yes, he is.

Q Especially in Phoenix, and overall?
A All over America.
Q All over America.
But the rest of the boys, they weren't going to go with you to Detroit to see your father, this prominent gypsy in Detroit, right?
A Because they didn't know at the time. I told them on the train what happened.
Q Now Stele Costello, he told the FBI that he knew you, that he had met you in the Bicycle Club, right?
A Me and Danny did meet somebody. I was playing Pan Nine, I was winning some money, and Danny came to me with this guy named Steve. So I can't say -- I never seen Stele Costello in the face. I didn't know, okay, this is the guy or this is who he is or whatever. But he introduced me, he said, Dino, this is Steve, Steve, this is Dino, and stuff like that. He didn't say -- I don't think he said a last name. If he did, I was paying attention to my game of gambling. So they went to go eat at a Chinese place there at the Bicycle Club casino. They offered me to eat and I said no because I was gambling.
Q Even though -- you are saying now, your

testimony now is you didn't know a man you had met a few weeks before?

A I didn't know a man? Well, Danny Leo told me that this was Steve and stuff like this, you want to go eat. But I didn't know who he actually was or what this was about because gypsies, they love to gamble. There were a lot of gypsies there at the Bicycle Club casino on Florence in Huntington Park.

Q Isn't the truth, Mr. Mitchell, that you were going to Chicago to take the stolen bonds to Stele Costello?

A Is it true that I was taking them?

Q Right.

A No, sir, it's not true.

Q And that's not what Danny Leo said yesterday in his testimony, right?

A That's what he said, but I believe it was to get a deal where he could go back home to his family and he ratted on me for it.

Q So he lied?

A But he will pay for that through God, you know. God judges people like that.

Q And that is not what Stele Costello told the FBI, right? Stele said that you were involved in this?

A By paperwork, actually Steve Costello said he never talked to me or dealt with me. This is what I heard. Now I'm not 100 percent sure if that's a true statement or what, but this is what I heard by my former attorney, what she told me. I believe my attorney, Mr. Steele, said that also.

Q Okay. I am showing you what's been marked as Government Exhibit 19. I would just like you to read to yourself. This is what Costello told the FBI, what they recorded that he said.

A This is after Danny made a deal with the FBI or was this three or four days later, or was it the same exact date?

THE COURT: Can you tell me what page you are looking at?

MR. ROMNEY: Yes, Your Honor. I'm looking at page 1 of the document, fourth paragraph.

BY MR. ROMNEY:

Q Will you read where it's highlighted there. It's just a short sentence.

A Read it in my mind?

Q In your mind, yes.

Are you finished with that?

A That is not true. My dad was not at the Bicycle Club.

Q Mr. Costello does say that he knows you?
A Well, this says at the Bicycle Club, that my dad introduced me to Steve Costello, which my dad was not there, he was in Detroit, and my dad is not a gambler. So where you are getting this at I don't know, but it's not true.
Q All right. Now you weren't pressured at all to plead guilty to this crime?
A Was I pressured? I guess if you are not guilty and somebody says you have five years written on your forehead, and my brother and mom was telling me maybe it's better for you to do the nine to 14 months than getting five years, I guess it would make you think quite differently. It was a catch-22, damned if I do, damned if I don't.
Q Mr. Mitchell, you had over a year from the time you were arrested until your trial to decide whether or not you were going to plead guilty or go to trial and say you are innocent, right?
A Well, in a year and a half I have never pled guilty and I didn't want to plead guilty, and I always kept my same story, the truth, and I did not want to plead guilty.
Q You knew what the government's evidence was against you during this time?

A Conspiracy.
Q You had conversations with the lawyer about the evidence -- with your lawyer about the evidence?
A I kind of knew what was going on, but I figured, you know what, I think God will see me through this and make the truth come out and I'm going to fight for my rights. And then when they put five years on your head saying that this is what you are going to get, you go to trial, you are going to lose, I'm like, whoa, it just totally changes you. Maybe you don't understand because you are not sitting in my shoes. But if you were to sit in my shoes and go through this, I think it would put some numbers on you.
Q You weren't in jail during this time?
A Was I in jail?
Q Right.
A I think it felt like forever, but I think I was in for a week or two.
Q Then you were released, just like Danny Leo?
A On a $10,000 bail, cash bail.
Q You also knew the sentence that Danny Leo got?

A Did I know his sentence?
Q Yes.
A Actually I think he was supposed to do 24 months, but since he made a deal -- excuse me when I say it -- with the government, he got one year one day, and he only did six months for squealing on me. So that's what it all boils down for me.
Q Now, Mr. Mitchell, you took an oath to tell the truth today, right?
A Yes, I did, like I did last time.
Q Just like you did when you pled guilty to this crime?
A Yes, I did.
Q Same oath?
A Yes.
Q So a year ago your testimony was that you were guilty, that you knew about the bonds, and that you were helping the boys take them to Stele to cash them in Chicago, correct?
A Yeah, because my former attorney told me to go in there and plead guilty, and she actually told me minor involvement --
Q We're going to get to that and you'll have a chance to explain that. But that was your testimony a year ago, fair?

A Yes, it was.
Q Your testimony today, though, is that you are not guilty, you didn't know anything about the bonds at all?
A Correct.
Q Those, Mr. Mitchell, are two opposite statements; is that fair?
A Two opposite statements? I think it's a change of heart maybe.
Q Those two can't exist at the same time?
A Okay. If you say so, all right.
Q You would agree either you lied and violated your oath a year ago or you are lying to all of us today?
A I understand where you are coming from, but, like I said, five years is a long time for something you don't do. She said, I think you need to go in there and make -- plead guilty to very minor involvement, which when I came in here I told Mr. Judge Stewart that I was guilty of the conspiracy. And actually I was kind of mad and I said I'm guilty to everything. I just wanted to get this over with, past --
Q You were under pressure because you were facing a felony count, correct, a felony charge?

A I am not sure if it was a felony or what, but I was just looking -- the main thing was I was looking at five years for something I didn't do.
Q Let me ask you a few questions about that hearing before we conclude here. You knew that you could be punished for lying and not telling the truth?
A When I first pled guilty?
Q When you pled guilty.
A Actually, no, I didn't.
Q You know what perjury is?
A Lying to a police officer?
Q Perjury is a crime.
Let's look at -- let's look at your plea agreement here.
MR. ROMNEY: Ms. Lauder, can you pull up that exhibit. It's 20-1. If you will go to page -- excuse me, if you will go to paragraph 9.
BY MR. ROMNEY:
Q Now you know what that document is, right? That's your plea agreement.
A Okay.
Q Do you remember that?
A Okay.

MR. ROMNEY: In fact, let's go first to the end of -- the second to last page of the document.

BY MR. ROMNEY:

Q That's your signature, right?

A Yes, it is.

Q And that's what you signed when you were at that plea hearing?

A Yes. I believe it was, yes.

Q When you signed this document, you attested that you knew what it was and knew what you were doing, right?

A I did not read it. I was just mad about what was going on and I signed it.

Q Okay. Now this paragraph says, I know that under a plea of guilty, the Judge may ask me questions under oath about the offense to which the plea is entered. The questions, if asked on the record and in the presence of counsel, must be answered by me, and if I give false answers, I can be prosecuted for perjury.

Now do you remember when the Judge specifically went over that in your hearing?

A Well, he was saying something. I didn't know he was reading that actual letter, yes.

Q But he told you you could be punished if you lied?
A Yes, I do remember that.
Q You knew that was a crime to lie at that time?
A Yes, and I do apologize to everybody for this. But, you know, I guess it's a catch-22, it's either five years or either nine months. Okay, let me just waste my life for nine months and get it over with.
Q Judge Stewart told you that you should only plead guilty if you were in fact guilty and not for any other reason. Do you remember that?
A Then again, I was pressured. I had to go down that road. I mean, I think if you are facing nine months or five years, I guess at the time, pressured, worried, scared, I was thinking, well, okay, let me waste nine months of my life and there we go. I'm off to the races again.
Q You told the Judge that you read this agreement, that you understood it?
A I only had 15 minutes, which ten was out in the hallway trying -- everybody was trying to get me -- my brother was trying to get me to plead guilty, nine months, five years, I think you need

to, I think this, I think that. Okay, yeah, let's do it.

Q I'm going to show you what has just been marked for identification as Government's Exhibit 24. This is the full transcript of the plea hearing. And I would like you to look, please, for us at page 11. I'm reading off of 11, beginning with the Court.

THE COURT: Do you want to offer it and have it admitted before you do this?

MR. ROMNEY: I'm just going to ask him to read it to himself.

THE COURT: Do you not want this admitted as an exhibit?

MR. ROMNEY: Your Honor, I will now move to admit the entire --

THE COURT: It's up to you, Mr. Romney. I am not suggesting that you need to.

MR. ROMNEY: No, I'm going to read from it, so I will move at this time to admit this entire transcript as an exhibit.

THE COURT: Any objection?

MR. STEELE: No objection, Your Honor.

THE COURT: Exhibit 24 will be admitted.

(Plaintiff's Exhibit 24 was received into

evidence.)

BY MR. ROMNEY:

Q I'm going to ask you to read where the Court says Mr. Mitchell, down to right here.

A To the witness? Read it to myself?

Q Read it to yourself.

THE COURT: Do you have a copy of this for Mr. Steele?

MR. STEELE: Your Honor, we do have a copy.

THE COURT: You do. All right.

Mr. Romney, Ms. Malley indicates that the stipulation of facts may have been marked as Exhibit 24. Why don't we mark it as 25.

MR. ROMNEY: Thank you, Your Honor.

THE COURT: Exhibit 25 will be admitted.

(Plaintiff's Exhibit 25 was received into evidence.)

BY MR. ROMNEY:

Q Have you finished reading that, Mr. Mitchell?

A Yes.

Q So you remember telling the Judge you had read the agreement, that you understood the agreement?

A Actually my former attorney read it to me. I didn't know that, but now that I read it, that's what it's saying.

Q And you told Judge Stewart that you understood what the agreement was?

A Yes, due to pressure, due to scaredness. If someone got a gun at your head and say give me $50 or I'll shoot you --

Q Mr. Mitchell, you didn't have a gun to your head?

A Well, it's sort of that type of deal, you know what I mean, without the gun though. Staying five years in prison, I'd rather them pull out a gun and just shoot me and get it over with.

MR. ROMNEY: Mr. Lauder, will you please pull up document 20-1, the plea agreement, and go to page 7.

BY MR. ROMNEY:

Q These marks here, Mr. Mitchell, those are your initials, right?

A Yes, they are.

Q And let's read what you initialed to be true. And you are saying you are under pressure, so let's see what the document says here. Number two, no threats or promises of any sort have been made to

me to induce me or to persuade me to enter this plea. Your initials.

Number three, no one has told me that I would receive probation or any other form of leniency because of my plea. Your initials.

I have discussed this case and this plea with my lawyer as much as I wish to. Your initials. I am satisfied with my lawyer. Your initials.

Page eight. My decision to enter this plea was made after full and careful thought, with the advice of counsel, and with a full understanding of my rights, the facts and circumstances of the case and the consequences of the plea. I was not under the influence of any drugs, medication or intoxicants when the decision to enter the plea was made and I am not now under the influence of any drugs, medication or intoxicants. Your initials.

Number seven, I have no mental reservations concerning the plea. Your initials.

Number eight. I know that I am free to change or delete anything contained in this statement. I wish to make no changes because all of the statements are correct. Your initials.

None of that was true?

A Okay. So if I send the letter to Mr. Stewart, why would he withdraw my guilty plea, because -- answer that. Maybe you don't have to.

Q I ask the questions here, Mr. Mitchell.

A Okay. Well, it is my life we're talking about. But, yes, I did do that because it's just like a guy's got a gun to my head and I pull out 20, no, you still owe me 30, okay, here's another ten, no, you still owe me ten, okay, here's another ten. I've got a gun to my head.

Q Exhibit 25, page 23. Mr. Mitchell, this is Judge Stewart, you are pleading guilty voluntarily and of your own free will. Your answer, yes, Your Honor. Nobody had a gun to your head, did they, Mr. Mitchell?

A Actually, no, they didn't have a gun to my head, but maybe you are misunderstanding me. It's pressure. It's hard. It's something I never been through. And I always stay out of trouble. I just -- you know, it's just -- it's hard. It's the only way I can explain it. It's sort of like you got to do this. If I don't, I'm looking at five years for something I didn't do.

Q Fair enough. So you just went in and

said, fine, I'll plead guilty, I don't care what's in the document, I will sign it?

A At the time I wasn't thinking. I was just like, okay, if this is what it takes, let's do it.

Q Give me this thing and I'll sign it?

A Exactly.

Q But you didn't just say to Judge Stewart I'm guilty, right, you had to specifically state what you did?

A Well, I believe he read it to me and he asked me how do you plead to these charges.

Q You had to tell the Court exactly what you knew and what you did to be guilty of the crime?

A I believe so, sir.

Q But you didn't really care about that paragraph because you were just going to plead guilty and get it over with?

A It was a catch-22.

Q All right. Let's look at that paragraph in the document. This is Government Exhibit 20-1, paragraph 12. Okay. So this is the facts that you agreed to to plead guilty.

Now what is this writing here? What is that?

A The only thing I recognize is my initials,

but I don't know what the rest of it is.
Q It looks like there are some changes to the facts there, right? This is crossed out, it's amended a little bit. Isn't it true that you wanted these facts changed so they would be more accurate?
A Run that by me again.
Q Okay. Mr. Mitchell, if you didn't care what was in the plea agreement, why did you have this changed?
A I did not. That's my initials, but the rest of it is not my writing. I don't know what happened there, who did that, or when this happened.
Q Now Judge Stewart, he specifically --
A I can't even make it out, what it says.
Q All right. Well, Judge Stewart read it to you. Do you remember that?
A The whole letter you mean. Okay. I thought you meant the scribbling.
Q No, Judge Stewart read all of this to you.
A I'm sure he did.
Q And you had your attorney make these changes, right, because you didn't want --
A I did not have her make any changes.
Q You didn't want to admit that you had possession of the bonds. Do you remember that? So

you had Ms. Gorman cross that out and said Johnny Raymond was the one that had --

A That is not my writing. I do not remember doing that. The initials, yes, that looks like my initials, but the rest of that, I do not know what they did with that paper.

Q You wouldn't care because you were just pleading guilty?

A I did not really care at the time. I just wanted to get this over with, get the monkey off my back and move on in nine months, or whatever it was.

Q After Judge Stewart read this paragraph to you he asked you, and you were under oath, is this a completely true statement. And what was your answer?

A About the charges that was on me?

Q About this statement. He asked you, Mr. Mitchell --

A My attorney told me watch what you say and just go along with it, so it had to have been a yes. I know that was wrong, I'm sorry, I apologize to everybody, but, you know --

Q Thank you, Mr. Mitchell. That's all I have.

THE COURT: Mr. Steele.

MR. STEELE: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. STEELE:

Q Dino, do you have a credit card?
A No.
Q Do you have a bank account?
A No.
Q Carry checks?
A No.
Q Deal in cash?
A Yes.
Q You were asked about what you remembered Danny Leo saying yesterday about you going to Detroit and your father being sick --
A I'm sorry, sir. Did Danny ask me what?
Q Mr. Romney just asked you, it's been a couple minutes ago, if you remembered that Danny Leo said you never told him about Detroit and you never told him about your father being sick. Do you remember being asked that question?
A Yes, I do.
Q Do you remember Danny talking about that piece at all?
A If he was asking me about my dad or anything?

Q Uh-huh. (Affirmative)
A Well, I did told him in Sacramento the next day what happened between me and my wife. So I did notify the boys, yeah.
Q Is your memory yesterday of Danny Leo, it was characterized to you by Mr. Romney that Danny Leo said you didn't say those things. Do you remember yesterday Danny Leo saying he doesn't recall?
A Yes, I do. I guess it was part of his plea.
Q Do you have Exhibit 19 up there? It's the report about Costello.
MR. STEELE: If I might approach?
THE WITNESS: The highlighted areas?
BY MR. STEELE:
Q You were asked to look at paragraph 4.
A Okay.
Q And you read that.
A Yes.
Q It talks about how Steve Costello knows you from meeting you at the Bicycle Club.
A Yeah, with my dad it says.
Q What does the last sentence there say?
A The Bicycle Club is a poker room.

Costello never had any other dealings with Dino.
Q Now do you have the transcript of your statement up here? I believe you do.
THE COURT: The change of plea statement?
MR. STEELE: No. I'm sorry, Your Honor. The statement from the 19th, Exhibit E.
BY MR. STEELE:
Q If you would turn to page 30.
A I'm there.
Q I want you to count down from the top line, okay, on the eleventh line.
A It says my dad right there?
Q My dad is very sick, yes.
A Do you want me to read this?
Q I want you -- I want you to read to yourself that sentence. After reading that --
A Okay. How far do you want me to go down? I'm sorry.
Q Let me ask you the question, and then if you have to read more, let me know.
A Thank you.
Q Did you tell Special Agent Argyle that you got calls from your brother and your sister about your father --
A Yes, I did.

Q -- last night --
A On the train, yeah.
Q -- while you were still on the damn train?
A On the damn train. That's what it says here.
Q Dino, when you were crying, when you were talking about your wife after you had been arrested --
A I wasn't arrested, but I was at the train platform and we were in the lobby where they checked the bags, and they separated us in rooms. I was by myself. And I don't know who the people were. I'm sorry that I pointed at you, but I thought you was there. I'm very sorry about that. Maybe you was, maybe you wasn't. I don't remember.
Now what was the question?
Q You are in this room. Do you remember what you were doing, where were you when you talked about your wife when you were crying?
A I was standing about here. It was a counter right here. Somebody was half on it and their feet were on the floor. There were a few more guys there. They were asking me what happened and stuff like that. I told them I went to Sacramento and I had sex with another woman, and that I was on

my way to my dad in Detroit, but we were stopping in Chicago first.

Q What were you also doing while you were in that room?

A As in -- I'm sorry?

Q Why did you have a napkin?

A I was crying because I admitted to the FBI agents what I did to my wife and it really hurted me and bugged me.

Q Did they give you anything to eat?

A Yes, they did, a pizza I believe, because I haven't eaten like a day -- it felt like a day and a half to me. It felt like a long time on the train. But they did give me some pizza that they ordered.

Q Was this before they moved you to the jail for the interview?

A This was before -- yeah, before the jail. This was at the train station.

Q As far as you know they weren't recording it, or do you know?

A I don't know to be honest with you.

Q It's a different place than where you were interviewed and it was recorded?

A Yeah, it was at the train station where

they threw us off the train. That's where I explained my story to them.

MR. STEELE: That's all I have, Your Honor.

THE COURT: Thank you, Mr. Mitchell.

THE WITNESS: Okay. Thank you.

MR. ROMNEY: I have nothing, Your Honor.

(Proceedings not transcribed)

C E R T I F I C A T E

I hereby certify that the foregoing matter is transcribed from the stenographic notes taken by me and is a true and accurate transcription of the same.

PATTI WALKER, CSR-RPR-CP DATED:
Official Court Reporter
350 South Main Street, #146
Salt Lake City, Utah 84101
801-364-5440